Before we proceed any further, it is my great pleasure, honor, and duty to let you know that this is the first day that our new colleague, Judge Scudder, is sitting with us. So he will be here with us for the last two cases and many, many more. So, welcome. And we welcome him to show business. That's right. So, our fifth case for this morning is United States v. Omeed Memar. Mr. Kameli. May it please the Court. Your Honor, my name is Tahir Kameli and I represent the appellant, Dr. Memo, who raises actually three questions in this appeal. Did the United States government provide sufficient evidence to prove beyond a reasonable doubt that Dr. Memar committed health care fraud under 18 U.S.C. 1347 and made false statements under 18 U.S.C. 1035 by stating that eight patients referenced in the indictment had 15 or more actinic keratosis? So let me ask you, I mean, it seems to me that this is a circumstantial case, as a great many cases are, but there are certainly some facts in particular that are quite troublesome and facts from which it seems to me a rational jury could infer that he knew that these people did not have actinic keratosis, that he was using this intense pulsed light system and defrauding the insurance companies by using it for conditions that wasn't called for, things such as his abrupt change in practice after the Blue Cross agent comes, things such as his failure ever to follow up on these people, having the medical assistants just do it and copy the same alleged lesions all the time, and the absence in the medical records of any indication that these lesions are the very difficult to perceive ones that you say certainly is a matter of theory, there could be such a thing, but he doesn't describe them this way. So those are just a few of the facts that bother me. Judge, great questions, and I believe that we have mentioned and addressed every single one of those in our brief. But you see, you can, let me ask you to draw a distinction between making the argument you would make for the jury, which perhaps might have seen things in the light that you did, and taking the perspective that we now have to take, which is assuming all facts that we can consistent with the jury's verdict. The jury has made the credibility determinations, and we don't have any authority to disagree with it in that sense. Judge, there is a, the government has to prove beyond a reasonable doubt, either with direct or circumstantial evidence, every element of those two statutes. That's right, but now we're under the Jackson against Virginia standard. Are there any facts in this record that would support the jury's verdict? Judge, there is, there are facts that does not show any intent, any proof of intent. There is absolutely nothing shown. In reality, Judge, the whole case, the whole case is in regards to the difference of opinions. There is one physician indicating that, yes, there were lesions. There is another physician saying that there could have been lesions, even though you could not see the lesions that could be hidden. But he didn't describe these eight people that way, not in the medical records. And again, I think you're twisting the standard of review around in a way that's not accurate. Judge, they have to prove, the government has to prove beyond a reasonable doubt. The standard of review... Now, to the extent there's ambiguous evidence in the record, we have to assume the jury was persuaded the government's way. But not based on suspicion and speculation. There is a case of U.S. v. Jones, 2013, that it says that the court decided that our criminal justice system doesn't tolerate the conviction of people based on suspicion and speculation. And, Judge, there was nothing in the record. There were opinions. There were conjunctures. There is absolutely nothing to show that the diagnosis that was made by Dr. Mehmar was wrong. Nothing. Even if you look at the witnesses that the government has provided, every single witness who took the stand, none of those individuals had indicated that the IPL that was used, the method that Dr. Mehmar used, was wrong. In reality, it's 53% of the time it is effective. I just have to take exception to what you're saying. He had some patients who did have, unequivocally, actinic keratosis. And those are the older people, and maybe he was using IPL as an experimental technique, but he also used other very well-accepted techniques, such as the nitrogen technique, such as cream, such as using the IPL with the acid that was put on. He didn't do that with any of the eight people who were the subject of the indictment after the Blue Cross guy had the conversation. They just stopped, and he didn't follow up in any way. That's an interesting piece of circumstantial evidence. Judge, in reality, the Blue Cross and Blue Shields, Judge, in 2013, when they had a meeting with Dr. Mehmar, Blue Cross and Blue Shields indicated that we are not going to reimburse IPL because it's experimental. And so what happens? He doesn't switch over to the other techniques at that point. He just says, here's the bill for $300. Judge, the billing dropped from 13 patients to five. So he didn't stop. There are so many other factors that he had. The individuals, Judge, look at the Obamacare that happened. In the beginning, there were deductibles that had to be met. Look at the timing that the bills were provided. And, Judge, nothing in the procedures, nothing in the standard of care of any physician indicates that they have to follow up after the patient leaves the practice. Nothing indicates that. At best, this case is a difference of opinion between two physicians, setting up a standard of care. We are coming up, Your Honors, this is an important case not just for Dr. Mehmar, but for every physician in the three states that you have jurisdiction. We are setting up a new standard of care. We are looking at these physicians and asking them not to practice medicine. We are questioning. Go ahead. You know, I read your brief carefully. Yes, sir. And you feature in your brief, understandably, nine separate pieces of evidence as you lay them out. And I also read the closing argument that Mr. Stays made to the jury. And am I right in my impression that the points that you make about the nine pieces of evidence are effectively the exact points he made in his summation to the jury? With some degree of difference. And doesn't that come back, bring us back to the point that Judge Wood is making about the standard? In this court, you know, as I read the case law, it has to conclude under Jackson v. Virginia that the record contains no evidence, regardless of how it's weighed, from which a jury could find guilt beyond a reasonable doubt. That's a high burden, is it not? It absolutely is. It absolutely is. But that's the reason we have to look at the evidence that was provided by the government. And you'd agree, look at it in its totality. Totality, absolutely, the totality. But if you look at the totality with the nine items that we brought up, even looking at the government's witnesses, the government's witnesses do not support the government's point of view. They do not. From the expert that they had, Dr. Ross, indicating that AK lesions do not have to be red and scaly. It could be hidden. What they could be, he does acknowledge that at one point, what they could be is one thing. What Dr. Mimar said they were for these eight people is another thing altogether. They are, in fact, usually red and scaly lesions that somebody has. Judge, they are usually, but even Dr. Ross. And he said they were. He drew pictures of where they were on people's faces. Judge, Dr. Ross indicated, the government's witness, expert witness, indicated that it doesn't have to be red and scaly all the time. I'm saying it's okay. There's some hypothetical person in North Dakota who doesn't have them that way. But he says these eight people, the people who were the subject of the indictment had the red and scaly lesions, and yet they testified, no, we didn't. You know, we didn't have, I went in for acne, I went in for rosacea, I went in for some other thing. Judge, at this point, this court and the lower court and the jury, are we questioning the expertise of the physician, then what is lesion and what is not? Are we questioning that with what the patient had seen could be totally different than what Dr. Memar, based on his expertise of more than 15 years, would see? We are looking at the difference between Dr. Memar's own notes on his medical notes and what was really happening. Judge, the medical. Are you telling me that doctors alone in all professions in our society never engage in fraudulent activity? I'm not saying that at all. That wouldn't be. But, Judge, in regards to the, if you look at this case, Judge, based on the nine points that we brought up, this is a case of a difference of opinion, and that's all it is. Whether the doctor, Dr. Memar was the only person in that room who had the medical expertise to determine whether there is AK lesion or not. Period. And then based on his determination. But if he says something readily observable, you have a red spot on your face. You have more than 15 red spots on your face, actually, because he was up billing it. And then there's a contemporaneous photograph of the person, and the person says, I didn't have red spots on my face. That's not medical. That's just sheer observation. Your Honor, are we thinking that these lesions that are red, they're big spots that the patient can see? They're discernible. They are looked at under the magnifier. That's what it was. Are we able to see it with the naked eye? Absolutely not. That's not what he said, though. I mean, the jury was entitled to assume, to find, that he told them that they needed treatment, and they didn't. Judge, all of these patients, they walked into Dr. Memar's office because they voluntarily. And they wanted cosmetic procedures that they didn't have to pay for. Judge, everything, almost everything could be looked at as cosmetic in medical field also. No. There are so many things, Judge. If Dr. Memar, Your Honor, with all due respect, if Dr. Memar actually removes a wart on someone's nose, would that be medical or would that be cosmetic? It could be looked both ways. I thought with AK, one of the concerns is cancer. Absolutely. And a precancerous, that's a far cry from cosmetic. Your Honor, every single patient that Dr. Memar, from these eight individuals, AK lesion is a precancerous. So the treatment of eye peel that was provided was to treat that precancerous. But that's what it was. Absolutely, it was a medical procedure. Right. I mean, it may be cosmetic in that the lesion goes away, but it's also, there's also some medical necessity behind it. After breast construction, after cancer surgery, after removal of the breast could be looked at as cosmetic also, but it's a medical procedure. And you talk about Dr. Ross, but I read the cross. I read his testimony, and it's pretty clear that he said, look, in his own opinion, eye peel alone is not something that he sees done in the community to treat AK. Did he not so testify? But he said that also he acknowledged that there are articles that 52 to 53 percent of the AKs can be treated with eye peel. He did say that also. In reality, Your Honor, there is absolutely, there is absolutely no limitation set by American Academy of Dermatology to limit them about what kind of method they can use. Well, let me. You're in your rebuttal. Probably, yes, this is what Judge Bauer was going to tell you. If you would like to save a little time for rebuttal, you're about to. Yes, Your Honor. I keep the last two up. You can keep the last two minutes. Thank you. All right, very good. So, Mr. Lee, it's your turn. May it please the Court, my name is Stephen Lee. The properly instructed reasonable jury here found that the government's abundant evidence proved that the defendant used false diagnosis, false diagnoses of itinic keratosis lesions, in order to get patients' insurance companies to pay for cosmetic treatments that the patients did not need and should have paid for themselves if they wanted them themselves. The evidence showed that when the defendant talked with patients, particularly young patients, about making their skin look better, he got their insurance companies to pay for the cosmetic treatments by adding false diagnoses to the patient charts, by adding fake diagrams to the patient charts to make it look like the patients had multiple scaly plaques on their faces. Well, they had to have more than 15 for the billing code he was using. Was it 15 or more? He used typically 15 scaly plaques or 25 scaly plaques in order to hit the highest billing code that was available for 15 or more itinic keratosis lesions. So he added those false diagnoses to the charts. You had testimony that the people presented with other problems. I mean, they came to him. He didn't go out. Somebody walks into his office and has, what, acne, just says my skin is ugly, says something? Yes, generally speaking, acne, melasma, rosacea, issues like that. And so patients would come in. They would get examined. And then they would talk about how to make their skin look better. So there's no reason to think the patient ever saw what was written down in the chart? There's no evidence in the record to suggest that. There was one patient who testified that especially as she continued to get months and months of these IPL treatments, she suspected that Dr. Marmar was doing something to fool her insurance company. And she continued going to Dr. Marmar's practice specifically for the IPL treatments that he was somehow getting the insurance company to cover while she went to another dermatologist at the same time for the medical issues that she wanted addressed. And those were records that were admitted. Did the trial record with respect to the eight patient witnesses that the government called, did any of those eight witnesses testify that they were informed by the doctor that they had a precancerous skin condition? I believe most of the patients gave clear testimony about that. I think some of the questioning might have been not as clear about some. But most of the patients testified clearly that they did not recall the doctor ever telling them that they had actinic keratosis or a precancerous condition that had to be treated medically or that the treatments they were getting, the IPL treatments, were for a medical reason. The patients thought it was for aesthetic reasons, for cosmetic purposes, or to treat conditions other than actinic keratosis, such as rosacea. So the government is arguing to the jury if somebody really does have something serious, such as a precancerous lesion, one can assume the doctor would tell them that. Yes. And that's what the defendant himself told the FBI agent when he was interviewed, that when a patient actually had a condition such as actinic keratosis, it was a serious issue, he would tell them about this condition, he would go through treatment options, and he would deal with it. And he had patients like that. Remember, he had older patients, right, who were more typical AK patients. Yes. And as Your Honor discussed earlier, I think there's a sharp contrast between the patients that the defendant introduced in his defense case and the patients who were introduced in the government's case in chief, and I think that actually highlights some of the issues here, and it does raise support for the reasonable inference that the defendant knew what he was doing when he put the false diagnoses into the patient's charts from the ones in the case in chief. He treated all the patients whom the defendant called in his case. They were familiar with their conditions. Some of them were even able to point out the actinic keratosis lesions that they had. They were familiar with other treatment methods that the defendant had used over time, and so all of them, and some of them, had their actinic keratosis lesions biopsied and proven to that extent. So all in sharp contrast to the younger patients, typically, who were part of the government's case in chief. If the defendant had actually believed that these younger patients actually had large numbers of actinic keratosis lesions, he would have treated them very differently. He would have taught them. He would have actually reviewed some of the treatments and why the treatments were having no medical effect after months and months and years. So could you pause on that for a minute, because one of the things Dr. Mamar pushes is that there was a difference of opinion in the medical profession about whether IPL alone, without the acid, without other supplemental treatments, might be an effective way to treat AK, and I guess there was some discussion about a PowerPoint presentation where he's a little more cautious and says it's still experimental, but doctors do off-label and experimental things from time to time, and that's okay. Yes, Your Honor. I think the government's position is that IPL alone is not an effective method of destroying actinic keratosis lesions, and the district court found... But are you making a medical judgment on that? How much difference of opinion is there in the medical profession about that? Your Honor, I think as the district court found, the evidence was scant in support of this idea that IPL alone could be effective. Two doctors in the government's case in chief gave testimony consistent with that. Dr. Ross testified that IPL alone was not a method of destroying actinic keratosis lesions. The other dermatologist who was called Dr. Robinson... Dr. Robinson, yeah. She was asked a question about this, and her response showed that she did not believe that IPL alone was a method of destroying actinic keratosis lesions. So you see this as a fact that the jury would have resolved? No, and as they were told during closing arguments, they did not necessarily need to reach that issue because if these patients didn't have...if the diagnoses were fake to begin with, if they didn't have actinic keratosis lesions, then obviously whether or not the IPL would have... they would need to resolve the question as to whether the IPL alone would have destroyed such lesions. And so they didn't necessarily need to reach that issue. But again, the evidence overall supported the finding, would have supported the finding, that the method being used here was not actually destroying in the instances that the defendant billed for the destruction of actinic keratosis lesions. Mr. Lee, can you address the issue that's raised about the government's summation? Yes, Your Honor. I know the government acknowledges that there was a misstatement of what the trial evidence showed. Do you think it's a fair reading of the summation, though, to say that that statement, the one that was mischaracterized as made to the Blue Cross Blue Shield representative, it was featured a bit, was it not? It was featured in the government's opening summation. And the statement that was made was that he admitted to Blue Cross Blue Shield that the treatments were cosmetic or for photo rejuvenation purposes, correct? Yes. When in fact what his actual statement was to Blue Cross was that they were preventative. Yes. Isn't, in the context of this case, isn't that difference, is it meaningful? And what I mean by that is when you're talking about AK, right, and we're talking about a cancerous or precancerous condition, the word preventative may support the view that he's treating a patient for a precancerous or a cancerous skin condition. Your Honor. Right. In other words, the government's use of photo rejuvenation and calling it cosmetic, isn't it of some consequence? Or should we not be concerned about that in the context of these facts? Ultimately here, no, because ultimately here the issue, as it was raised in the government's opening summation, might have been interpreted in certain ways, might have been interpreted in the way that you're discussing. But then here not suffering prejudice because for multiple reasons. First of all, the defendant, first of all, the defendant in his closing argument attacked the government's characterization of that Blue Cross Blue Shield meeting, making it very clear to the jury that there was a very stark difference in recollection as to what had been said, thus putting the issue in front of the jury. So your point is Mr. Stays made the exact point that I just made? He made it. Well, he didn't make exactly the argument that you made, but he attacked the government's credibility. He used it to attack the government's credibility overall. And so he did highlight the fact that the government had made a misstatement. Now, so first of all, so the defense counsel did object to this, did not object, but he did challenge the government's argument in this regard. Second of all, the jury was properly instructed that what the counsel says is not evidence and that they should rely on their own recollections of the evidence. And, again, given the way it was argued, it was very clear to the jury that there was a difference. This was a disputed point as to what exactly had been said. And, again, third, again, going back to my earlier comment, the jury did not necessarily need to reach the issue as to whether Dr. Marmara thought the treatment was preventative or whether he thought it was for photo rejuvenation, again, because the diagnoses were false to begin with. The patient whom was specifically being addressed in the course of that Blue Cross Blue Shield meeting, the jury did see the patient files and did spend a little time going through that. This was a patient who had a surgery, who had a scar from the surgery, and then was being looked at as a follow-up on that scar. And then, suddenly, when the defendant was talking to her about making the scar look better, then, suddenly, the defendant put in a diagnosis, a false diagnosis, of 15 actinic keratosis lesions that he supposedly treated with IPL. So, again, whether the ultimate treatment, whatever the defendant said about those words, was not something that the jury necessarily needed to resolve in order to conclude that the diagnosis was false and the treatment was improperly billed to Blue Cross Blue Shield. Well, we have the two theories. We've got the health care fraud theories, and then we have the making false statements related to the health care fraud. It seems a little bit piling on. I mean, he gets the 16 guilty verdicts, but the health care fraud itself, I take it, is what? Is the submission of the claims and the false statements are in the records? Yes, Your Honor. The health care fraud counts focus on the submission of an improper false claim. To the insurance companies. It's not just Blue Cross. There's a bunch of them, right? Yes. Blue Cross Blue Shield primarily, though. So that focuses on the submission of a false claim. The false statement counts focus on the defendant putting false information into the patient's medical record or training his staff and causing them to put false information into the medical records, which they did by basically just simply copying the original false statements that the defendant made when he first added in the false diagnoses and the IPL treatment plan. Unless the court has any further questions, the government asks you to affirm the conviction here. All right. Thank you very much. I think you have a little bit of time left. Your Honor, so the witnesses of the government themselves said that if Dr. Ross indicated that, that if someone looks at his records, it may look like he's copying. And it's the same thing. It's the same thing that if the same procedure is happening the next day and the next day, it's the same idea that maybe someone who's doing it is not copying but is just writing what is written about. So that should not be part of an intent to defraud the government, to defraud the insurance company. And Judge, in regards to the difference of opinions that we're talking about, if you look at the case, Dr. Ross is a physician whose 80 percent of his practice is about cosmetics. That's what it is. He's not a dermatologist per se that deals with the diseases every day. And if you look at the difference of opinions of these two individuals, Dr. Mehmar, who was hands-on, who was in the room, who had the firsthand knowledge of the skin of the patient, versus someone who is just reading the record, we are now sitting in a situation that this court is trying to look at the second opinions, look at the different opinions of individuals, and try to use that against a defendant. And if you look at the July of 1996, Judge, the Congress report indicates that the Congress never had an intention to use 1347 to penalize the exercise of medical judgment of health care treatment choices made in good faith and which are supported by evidence or held by a responsible minority of those providers who provide similar methods of treatment. American Academy of Dermatology has no limitations of what kind of treatment the physicians can use in order to treat AK. They do not. Dr. Mehmar decided to use the IPL. Others may do different. That does not make him criminal. Thank you. All right. Thank you very much. Thanks to both counsel. We'll take the case under advisement.